AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)    ☐ Original    ☐ Duplicate Original

| LODGED |
|---|
| CLERK, U.S. DISTRICT COURT |
| 08/13/2020 |
| CENTRAL DISTRICT OF CALIFORNIA |
| BY: DM          DEPUTY |

# UNITED STATES DISTRICT COURT
for the
Central District of California

| FILED |
|---|
| CLERK, U.S. DISTRICT COURT |
| 08/13/2020 |
| CENTRAL DISTRICT OF CALIFORNIA |
| BY: GR          DEPUTY |

United States of America

v.

Hovanes Sungulyan,

Defendant

Case No. 2:20-mj-03840

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of August 13, 2020, in the county of Los Angeles in the Central District of California, the defendant violated:

*Code Section*

21 U.S.C. § 841(a)(1)

*Offense Description*

Possession with Intent to Distribute Controlled Substances

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

/S/
Complainant's signature

Reese Stewart, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone. Date: Aug. 13, 2020

*[signature: Karen L. Stevenson]*
Judge's signature

City and state: Los Angeles, California

Hon. Karen L. Stevenson, U.S. Magistrate Judge
*Printed name and title*

**AFFIDAVIT**

I, Reese Stewart, being duly sworn, declare and state as follows:

### I. PURPOSE OF AFFIDAVIT

1. This affidavit is made in support of a criminal complaint against Hovanes SUNGULYAN ("SUNGULYAN") for a violation of 21 U.S.C. § 841(a)(1): Possession with Intent to Distribute of a Controlled Substance.

2. This affidavit is also made in support of an application for a warrant to search: (1) Room #109 of the America's Best Value Inn, 7222 Rosemead Blvd., Pico Rivera, California 90660 (the "SUBJECT PREMISES") as described more fully in Attachment A-1; and (2) a White 2014 Mercedes E350, bearing California license plate # 7FGR338 (the "SUBJECT VEHICLE") as described more fully in Attachment A-2.  This affidavit incorporates a prior application for a warrant and warrant issued by the Honorable Karen L. Stevenson, United States Magistrate Judge, attached hereto as Exhibits 1 and 2.

3. The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) (possession with intent to distribute and distribution of controlled substances) and 846 (conspiracy and attempt to distribute controlled substances) (the "Subject Offenses"), and 18 U.S.C. § 924(c) (Possession of Firearms in Furtherance of Drug Trafficking Crimes) (the "Subject Offenses"), as described more fully in Attachment B.

Attachments A-1, A-2, and B, and well as Exhibits 1 and 2, are incorporated herein by reference.

4. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and search warrant, and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND OF AFFIANT

5. I am an investigator or law enforcement officer of the United States, within the meaning of Title 18, United States Code, Section 2510(7), and I am empowered by law to conduct investigations of, and to make arrests for, narcotics trafficking and money laundering violations under Titles 18 and 21 of the United States Code.

6. I am a Special Agent ("SA") with the Drug Enforcement Administration ("DEA") and have been so employed since June 2019. I am currently assigned to DEA's Los Angeles Field Division ("LAFD"), Enforcement Group 2, which investigates narcotics trafficking and money laundering violations under Titles 18 and 21 of the United States Code. I have received 16 weeks of specialized training in Quantico, Virginia, pertaining

to narcotics trafficking, money laundering, undercover operations and electronic and physical surveillance procedures.

7. Before becoming a Special Agent, I was employed as a Border Patrol Agent with the United States Border Patrol from March 2008 to December 2011. As a Border Patrol Agent, I conducted law enforcement duties pertaining to narcotics and human smuggling along the border between the United States and Mexico. In December 2011 I became a Deportation Officer with Immigration and Customs Enforcement, in which I conducted immigration and firearms investigations. From June 2017 to June 2019, I was assigned as a Task Force Agent with the Drug Enforcement Administration, in which I participated in narcotics investigations.

8. Throughout my career as a federal agent, I have received numerous hours of training in narcotics investigations, investigative techniques, surveillance, and evidence collection. I have been the case agent and co-case agent for investigations involving narcotics trafficking in the Southern California area. These investigations have focused on narcotics distribution, the laundering of narcotics proceeds and monetary instruments derived from narcotics activities, and conspiracies associated with narcotics offenses. I have debriefed defendants, informants, and witnesses who have personal knowledge regarding narcotics trafficking organizations. I have participated in narcotics investigations, including Title III wire interceptions, of numerous individuals involved in the distribution, possession, and manufacture of controlled

substances, such as cocaine, methamphetamine, marijuana, fentanyl, heroin, and oxycodone.  I have also participated in the execution of search and arrest warrants involving drug trafficking crimes.

      9.    I have learned that narcotics trafficking organizations utilize numerous individuals/co-conspirators each serving different functions and each possessing only a limited knowledge of the workings of their organization and the identity and the role of the co-conspirators.  In this way the organization can limit the damage done to the overall operation should one or more of its members be apprehended.  It also protects those persons who are responsible for the overall direction and operations of the organization against arrest and/or successful prosecution.  I also know individuals involved in narcotic trafficking organizations utilize the names of others or non-existent individuals to purchase or rent vehicles for the use in the distribution of narcotics; to purchase or rent residences, hotel rooms, businesses, and/or storage facilities to be used in the storage of narcotics and the proceeds of their sales.  This false identifying information is also used to purchase or rent digital pagers and cellular telephones to be used in the furtherance of narcotics transactions and in the subscription of utilities and other services.

      10.    Through my training, experience, and interaction with experienced SAs, Task Force Officers ("TFOs"), and other narcotics investigators, I have become familiar with the methods

employed by narcotics traffickers, in particular, practices to smuggle, safeguard, transport, and distribute narcotics, and to collect and launder narcotics-related proceeds.  These methods include the use of debit calling cards, public telephones, wireless communications technology (such as paging devices and cellular telephones), counter-surveillance, elaborately planned smuggling schemes tied to legitimate businesses, false or fictitious identities, and coded or encrypted communications, in an attempt to avoid detection by law enforcement and to circumvent narcotics investigations.  I know that during the course of these wire and electronic communications, organization members routinely use coded references and/or encryption in an effort to elude law enforcement detection; that narcotics traffickers often confine their illegal telephonic communications to well-trusted organizational members and other high-level narcotics traffickers; that, in order to minimize telephonic communications, traffickers often conduct "in person" meetings at secure locations; and that, a trafficking organization will typically maintain or have knowledge of one or more locations which can be used by members to conduct secure, private conversations in furtherance of their conspiracy.

     11.  Based on my training and experience, I know that records are often maintained by drug traffickers.  Further, drug traffickers in many instances will, out of necessity, perform record keeping.  This allows them to keep track of amounts paid and owed, such records will be maintained close at hand so as to readily ascertain current balances for money owed/paid.

12. It is also a common practice for traffickers to conceal large sums of money at their residences, either the proceeds from their drug sales/monies to be used to purchase controlled substances or items associated with the production of controlled substances. In this connection, drug traffickers use wire transfers, cashier's checks, money orders, and cash to pay for their controlled substances. Evidence of such financial transactions and records relating to income and expenditures of money and wealth in connection with drug trafficking would also typically be maintained in residences.

13. Typically, drug traffickers possess firearms and other dangerous weapons to protect their profits, supply of drugs, and persons from others who might attempt to forcibly take the drug traffickers profits and/or supply of drugs.

### III. **SUMMARY OF PROBABLE CAUSE**

14. On August 12, 2020, acting in an undercover capacity, I texted Hovanes SUNGULYAN ("SUNGULYAN") at (562)205-8855 to arrange to purchase 500 counterfeit, 30 milligram blue Oxycodone pills containing fentanyl (the "pills") at the American's Best Value Inn, 7222 Rosemead Blvd. in Pico Rivera, California (the "Inn"), the next day. Later that evening, while conducting surveillance of the Inn in advance of the controlled buy, law enforcement observed SUNGULYAN driving the SUBJECT VEHICLE.

15. On August 13, 2020, the Honorable Karen L. Stevenson, United States Magistrate Judge, issued warrants to search room 104 of the Inn, two vehicles, and the person of SUNGULYAN. Prior to execution of the warrants, law enforcement detained

SUNGULYAN, who was in possession of approximately 500 pills and a firearm in the parking lot of the Inn. While detained, SUNGULYAN stated that he was staying in room 109 of the Inn (i.e., the SUBJECT PREMISES). The Inn's management told law enforcement that SUNGULYAN was staying in both rooms 104 and 109 (the SUBJECT PREMISES) of the Inn.

16. In executing the federal search warrant for room 104 of the Inn, law enforcement found an additional approximately 1000 pills, another firearm, and SUNGULYAN's driver's license. Also in room 104, on top of the bed, were the keys to the SUBJECT VEHICLE.

## IV. STATEMENT OF PROBABLE CAUSE

17. Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

   a. On August 12, 2020, acting in an undercover capacity, I texted SUNGULYAN at (562)205-8855 to arrange to purchase 500 pills for $4000. SUNGUYLAN responded via text message to confirm that he would meet me on August 13, 2020, at the Inn, and sell me 500 pills. Later that same day, at approximately 6:48 p.m., law enforcement conducted surveillance at the Inn and saw SUNGULYAN driving the SUBJECT VEHICLE.

   b. On August 13, 2020, after SUNGULYAN arrived to the parking lot of the Inn to sell me the 500 pills, law enforcement intercepted and detained him. SUNGULYAN possessed

approximately 500 pills[1] and a firearm.  SUNGUYLAN stated that he was staying in the SUBJECT PREMISES.  When law enforcement separately spoke to the management of the Inn, management stated that SUNGUYLAN was staying in both rooms 104 and the SUBJECT PRESMISES at the Inn.

       c.    That same day, on August 13, 2020, the Honorable Karen L. Stevenson, United States Magistrate Judge, issued a warrant to search room 104 of the Inn, in case number 20-MJ-03817.  I incorporate the affidavit and issued warrant, which are attached hereto as Exhibits 1 and 2.  Pursuant to that warrant, law enforcement searched room 104 and found approximately 1000 additional pills, a white crystalline substance, another firearm, keys to the SUBJECT VEHICLE, and SUNGULYAN's driver's license.

### V.   TRAINING AND EXPERIENCE ON DRUG OFFENSES

18.   Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

       a.    Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds.  Drug traffickers often travel by car, bus, train, or airplane, both

---

[1] The pills seized from SUNGULYAN will be sent for laboratory testing.  However, based on my training and experience and my prior purchases from SUNGULYAN of pills that tested positive for fentanyl based on field testing, I believe there is probable cause that the pills seized from SUNGULYAN today are likely to contain an illegal controlled substance, such as fentanyl.

8

domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

      b.  Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs.  The aforementioned records are often maintained where drug traffickers have ready access to them, such as on their cell phones and other digital devices, and in their residences, vehicles, and other locations they frequent such as stash houses or hotel rooms.

      c.  Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices.  This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal.  In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

      d.  Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices and in their residences, vehicles, and other locations they frequent such as stash houses or hotel

9

rooms. Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices and in their residences, vehicles, and other locations they frequent such as stash houses or hotel rooms, including in the form of calendar entries and location data.

      e.  Drug traffickers often use vehicles to transport their narcotics and may keep stashes of narcotics in their vehicles in the event of an unexpected opportunity to sell narcotics arises.

      f.  Drug traffickers often maintain on hand large amounts of United States currency in order to maintain and finance their ongoing drug trafficking businesses, which operate on a cash basis. Such currency is often stored in their residences, vehicles, and other locations they frequent such as stash houses or hotel rooms.

      g.  Drug traffickers often keep drugs in places where they have ready access and control, such as at their residences, vehicles, and other locations they frequent such as stash houses or hotel rooms, including in safes. They also often keep other items related to their drug trafficking activities at their residence, such as digital scales, packaging materials, and proceeds of drug trafficking. These items are often small enough to be easily hidden and thus may be kept at a drug trafficker's residence even if the drug trafficker lives with others who may be unaware of his criminal activity.

      h.  It is common for drug traffickers to own multiple phones of varying sophistication and cost as a method to

diversify communications between various customers and suppliers. These phones range from sophisticated smart phones using digital communications applications such as Blackberry Messenger, WhatsApp, and the like, to cheap, simple, and often prepaid flip phones, known colloquially as "drop phones," for actual voice communications.

### VI. TRAINING AND EXPERIENCE ON FIREARMS OFFENSES

19. From my training, personal experience, and the collective experiences related to me by other law enforcement officers who conduct who conduct firearms investigations, I am aware of the following:

    a. Persons who possess, purchase, or sell firearms generally maintain records of their firearm transactions as items of value and usually keep them in their residences, vehicles, and other locations they frequent such as stash houses or hotel rooms, or in places that are readily accessible, and under their physical control, such in their digital devices. It has been my experience that prohibited individuals who own firearms illegally will keep the contact information of the individual who is supplying firearms to prohibited individuals or other individuals involved in criminal activities for future purchases or referrals. Such information is also kept on digital devices.

    b. Many people also keep mementos of their firearms, including digital photographs or recordings of themselves possessing or using firearms on their digital devices. These

11

photographs and recordings are often shared via social media, text messages, and over text messaging applications.

        c.  Those who illegally possess firearms often sell their firearms and purchase firearms.  Correspondence between persons buying and selling firearms often occurs over phone calls, e-mail, text message, and social media message to and from smartphones, laptops, or other digital devices.  This includes sending photos of the firearm between the seller and the buyer, as well as negotiation of price.  In my experience, individuals who engage in street sales of firearms frequently use phone calls, e-mail, and text messages to communicate with each other regarding firearms that the sell or offer for sale.  In addition, it is common for individuals engaging in the unlawful sale of firearms to have photographs of firearms they or other individuals working with them possess on their cellular phones and other digital devices as they frequently send these photos to each other to boast of their firearms possession and/or to facilitate sales or transfers of firearms.

        d.  Individuals engaged in the illegal purchase or sale of firearms and other contraband often use multiple digital devices.

## VII. TRAINING AND EXPERIENCE ON DIGITAL DEVICES[2]

20.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I

---

[2] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units;

know that the following electronic evidence, inter alia, is often retrievable from digital devices:

       a. Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

       b. Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently

---

desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

        c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

        d.    Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

    21.    Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

        a.    Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of

electronic evidence referenced above. Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

      b.    Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

  22.    The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

      a.    Users may enable a biometric unlock function on some digital devices. To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device. To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second. To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

      b.    In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked

for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

23. Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress SUNGULYAN's thumb- and/or fingers on the devices; and (2) hold the devices in front of SUNGULYAN's face with his eyes open to activate the facial-, iris-, and/or retina-recognition feature.

24. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

///

///

///

## VIII.     CONCLUSION

25. For all of the reasons described above, there is probable cause to believe that SUNGULYAN has committed a violation of 21 U.S.C. § 841(a)(1): Possession with Intent to Distribute a Controlled Substance.  There is also probable cause that the items to be seized described in Attachment B will be found in a search of the SUBJECT PREMISES and SUBJECT VEHICLE described in Attachments A-1 and A-2.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this __13__ day of
___August, 2020.

*Karen L. Stevenson*
_____
THE HONORABLE KAREN L. STEVENSON
UNITED STATES MAGISTRATE JUDGE